S12G0517. ARCHER WESTERN CONTRACTORS, LTD. et al.
v. ESTATE OF MACK PITTS et al.
S12G0526. CITY OF ATLANTA v. ESTATE OF MACK PITTS et al.
S12G0527. HOLDER CONSTRUCTION COMPANY et al.
v. ESTATE OF MACK PITTS et al.
(735 SE2d 772)

BLACKWELL, Justice.

After Mack Pitts was killed in a construction accident at Hartsfield-Jackson Atlanta International Airport, his estate and minor children sued the City of Atlanta and several contractors for breaches of contracts concerning the construction project on which Pitts had been working.[1] Although Pitts was not a party to these contracts, his estate and children asserted that he was an intended beneficiary and that they, therefore, had standing to sue for breach of the contracts. On cross-motions for summary judgment, the trial court found that Pitts was not an intended beneficiary, denied summary judgment to the estate and children, and awarded summary judgment to the City and contractors. In *Estate of Pitts v. City of Atlanta*, 312 Ga. App. 599 (719 SE2d 7) (2011), the Court of Appeals reversed, concluding that the trial court should have awarded summary judgment on the claims for

---

[1] The estate and children also sued the City for breach of a duty independent of its contractual duties, but that claim is not before us, and we, therefore, say nothing more about it.

breach of contract to the estate and children, not to the City and contractors. The Court of Appeals determined that Pitts was, in fact, an intended beneficiary of the contracts, and it found that the evidence was undisputed that the City and contractors had breached the contracts. We granted certiorari, and we conclude that the Court of Appeals misapplied or failed to apply several fundamental principles of contract law in its consideration of these cases. Accordingly, we vacate the decision of the Court of Appeals, and we remand for reconsideration consistent with this opinion.

1. The record shows that a joint venture of Holder Construction Company, Manhattan Construction Company, C. D. Moody Construction Company, Inc., and Hunt Construction Group, Inc. (the "Holder-Manhattan" joint venture) contracted with the City to build an international terminal at the Airport. Holder-Manhattan subcontracted the construction work to a joint venture of Archer Western Contractors, Ltd. and Capital Contracting, Inc. (the "Archer Western-Capital" joint venture), and Archer Western-Capital subcontracted a portion of that work to A&G Trucking, Inc. In June 2007, a truck operated by A&G Trucking at the Airport struck and killed Pitts, who was employed by Archer Western Contractors to work on the construction of the international terminal. His estate and children sued A&G Trucking for wrongful death and eventually won a $5.47 million judgment, but A&G Trucking apparently could not pay the judgment.

From the inability of A&G Trucking to satisfy the judgment sprang this separate lawsuit, in which the estate and children allege that the City, Holder-Manhattan, and Archer Western-Capital owed contractual duties to ensure that A&G Trucking carried automobile liability insurance sufficient to satisfy claims up to $10 million.[2] As the source of these contractual duties, the estate and children point to the contract between the City and Holder-Manhattan, as well as the subcontract between Holder-Manhattan and Archer Western-Capital. The estate and children contend that Pitts was an intended beneficiary of these contracts, that they, therefore, have standing to sue for breach of the contracts, and that the City, Holder-Manhattan, and Archer Western-Capital breached the contracts by allowing A&G Trucking to work on the construction of the international terminal without having automobile liability insurance with limits of no less than $10 million.

---

[2] It appears that A&G Trucking carried only $1 million in automobile liability coverage, as well as $2 million in excess coverage.

From the beginning of the construction project, the City and Holder-Manhattan contemplated that Holder-Manhattan might subcontract some or all of the construction work to one or more subcontractors, and they contemplated that those subcontractors might, in turn, subcontract portions of the work to other subcontractors. To bind any subcontractors to the terms on which Holder-Manhattan had agreed to build the terminal, the City and Holder-Manhattan agreed in their contract that,

> [b]y an appropriate written agreement, [Holder-Manhattan] shall require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to [Holder-Manhattan] by the terms of [the contract between the City and Holder-Manhattan], and to assume toward [Holder-Manhattan] all the obligations and responsibilities which [Holder-Manhattan] by [the contract between the City and Holder-Manhattan] assumes toward the [City]. . . . Where appropriate, [Holder-Manhattan] shall require each Subcontractor to enter into similar agreements with its Sub-Subcontractor.[3]

Consistent with this agreement, when Holder-Manhattan subcontracted the construction work to Archer Western-Capital, the subcontract incorporated the entirety of the contract between the City and Holder-Manhattan, and Archer Western-Capital agreed to be bound by the terms of that contract and to "assume[ ] toward [Holder-Manhattan] all of the duties and obligations that [Holder-Manhattan] has by [that contract] assumed toward [the City]." Archer Western-Capital also agreed to "likewise bind all of its lower tier sub-subcontractors and vendors to the obligations set forth in [its subcontract with Holder-Manhattan] and [the contract between Holder-Manhattan and the City]."

About insurance, the City and Holder-Manhattan agreed in their contract that the City would be responsible for procuring and maintaining policies to insure against certain risks and liabilities that might arise in the course of the construction project, that Holder-Manhattan and any subcontractors would be responsible for procuring and maintaining policies to insure against certain other risks and liabilities, and that, all together, these policies would provide "all

---

[3] The contract between the City and Holder-Manhattan defines "Subcontractor" as "a person or organization that has a direct contract with [Holder-Manhattan] to perform any of the Work at the site by virtue of an agreement ('Subcontract') with [Holder-Manhattan]."

reasonably necessary insurance" for the project. To procure and maintain the policies for which the City was responsible, the City and Holder-Manhattan agreed to employ a preexisting program administered by the City and known as the "Owner's Controlled Insurance Program" or "OCIP."[4] They contemplated that Holder-Manhattan and any subcontractor, other than a mere supplier, would be named as an insured on the policies provided by the City, so long as they complied with the requirements for enrolling in OCIP.

In an addendum to their contract, the City and Holder-Manhattan set out the specific policies that were to be procured and maintained by the City, as well as those that were to be procured and maintained by Holder-Manhattan and any subcontractors. Though its content is not limited to the policies to be provided by the City through OCIP, the addendum itself is, somewhat confusingly, entitled "Owner's Controlled Insurance Program" and is referenced in the contract as "OCIP."[5] The parties seem to agree that the OCIP addendum requires a subcontractor,[6]

> at its own expense, [to] purchase and maintain . . . such insurance as will protect [the City, Holder-Manhattan, the subcontractor, and their employees, among others] from claims of the type set forth below:
>
> > 1. Automobile, Bodily Injury and Property Damage Liability Insurance covering all automobiles, whether

---

[4] Extrinsic evidence in the record tells us that OCIP existed before the inception, and continues to exist independently, of the international terminal construction. Such extrinsic evidence is admissible, of course, to explain a contractual term that is ambiguous even if the ambiguity is only latent. See OCGA § 13-2-2 (1) ("All the attendant and surrounding circumstances may be proved and, if there is an ambiguity, *latent* or patent, it may be explained . . . .") (emphasis supplied); OCGA § 24-6-3 (b) ("Parol evidence shall be admissible to explain all ambiguities, both *latent* and patent.") (emphasis supplied); see also *Tolbert v. Short*, 150 Ga. 413, 419 (2) (104 SE 245) (1920) ("Where the description [in a contract for sale of land] applies equally to several tracts, a latent ambiguity results, which may be explained by showing which one of the several tracts was claimed by the grantor.") (citation and punctuation omitted).

[5] For instance, Section 13.2 of the contract provides that "[t]he OCIP is attached hereto as Appendix 'B' and incorporated herein by reference."

[6] This provision of the OCIP addendum actually refers to a "Contractor," a term that is defined nowhere in the OCIP addendum and that appears nowhere in the contract between the City and Holder-Manhattan. Nevertheless, the parties seem to agree that, upon entering a subcontract that incorporates the contract between the City and Holder-Manhattan and requires the subcontractor to assume the obligations of Holder-Manhattan, a subcontractor ordinarily would step into the position of a "Contractor" for purposes of this provision. The City, Holder-Manhattan, and Archer Western-Capital contend, however, that A&G Trucking was exempt for several reasons from the requirement that a "Contractor" carry $10 million in automobile liability insurance. We do not address these arguments about exemption.

owned, non-owned, leased or hired, with not less than the following limits:

a. Bodily Injury - $10,000,000 per person and occurrence . . . .

By its contract with the City, Holder-Manhattan agreed to "require each of its Subcontractors to procure and maintain during the life of any Subcontract, insurance of the type specified in [the OCIP addendum], except as otherwise agreed to by the [City]." In a somewhat redundant provision, Holder-Manhattan also agreed to

require each of its Subcontractors to procure and maintain, until the completion of the Subcontractor's work, insurance of the types and to the limits specified in [the OCIP addendum], unless such insurance requirements for the Subcontractor is expressly waived in writing by the [City] which waiver shall not be unreasonably withheld.

Holder-Manhattan promised in the contract that it would not commence work on the international terminal until it had both "fulfilled all its requirements under the OCIP" and "obtained all of the [insurance specified in the OCIP addendum for which it was responsible]," and it promised that it would not permit any subcontractor to commence work until the subcontractor had done these things. ·

2. The Court of Appeals concluded that Pitts was an intended beneficiary of the contracts among the City, Holder-Manhattan, and Archer Western-Capital,[7] and as a basis for its conclusion, the court pointed to a statement of purpose contained in the OCIP addendum. According to that statement, "[t]he purpose of the OCIP is to provide one master insurance program that provides broad coverages with high limits that will benefit all participants involved in the project."[8] Relying upon the dictionary definition of "participant," and noting that the contracts and OCIP addendum do not define "participant"

---

[7] See *Satilla Community Svc. Bd. v. Satilla Health Svcs.*, 275 Ga. 805, 810 (2) (573 SE2d 31) (2002) (for a nonparty to have the requisite standing to enforce a contractual promise, it must appear from the contract that the promise was intended for the benefit of the nonparty).

[8] The dissent apparently understands "broad coverages with high limits" to refer to "comprehensive coverage." "Broad," however, does not necessarily mean "comprehensive." The contract between the City and Holder-Manhattan does refer elsewhere to comprehensive coverage — it says that, "[t]hrough the OCIP and the Construction Manager's Insurance, the parties intend to purchase and maintain all reasonably necessary insurance for the Project" — but by its statement that comprehensive coverage is afforded by "the OCIP *and* the Construction Manager's Insurance," it suggests strongly that "the OCIP" alone is not meant to provide all coverage.

otherwise, the court reasoned that Pitts was a "participant" because he had a part in the construction project. Therefore, the Court of Appeals concluded, Pitts was an intended beneficiary of the contract between the City and Holder-Manhattan, as well as the subcontract between Holder-Manhattan and Archer Western-Capital into which the contract with the City was incorporated by reference.[9] *Estate of Pitts*, 312 Ga. App. at 603-604 (1) (a) (i). Upon our review, it appears that the analysis of the Court of Appeals was incomplete in two respects.

First, in determining the meaning of the term "all participants," the Court of Appeals appears to have failed to fully consider the context in which the term appears in the OCIP addendum. The Court of Appeals began its analysis by looking to a dictionary for the accepted definition of "participant," and that was a good place to start, inasmuch as we generally accept that contractual terms carry their ordinary meanings, OCGA § 13-2-2 (2), and a dictionary is a useful tool for narrowing the range of meanings ordinarily attributed to a word. But a dictionary does not always provide a complete answer. In this case, the dictionary tells us that a "participant" is "one that participates," and "to participate" means "to have a part or share in something." See Webster's New Collegiate Dictionary, p. 829 (1981). A dictionary does not, however, identify the "something" in which a "participant" has a part or shares. By necessity, that must be taken from the context in which "participant" is used. More important, the context in which a contractual term appears *always* must be considered in determining the meaning of the term. "[C]ontracts must be construed as a whole," *State Auto Prop. & Cas. Co. v. Matty*, 286 Ga. 611, 616-617 (1) (690 SE2d 614) (2010), and "the whole contract should be looked to in arriving at the construction of any part." OCGA § 13-2-2 (4). See also *Murphy v. Ticor Title Ins. Co.*, 316 Ga. App. 97, 100 (1) (729 SE2d 21) (2012); *Triple Eagle Assoc., Inc. v. PBK, Inc.*, 307 Ga. App. 17, 24 (2) (c) (704 SE2d 189) (2010); *Service Merchandise Co. v. Hunter Fan Co.*, 274 Ga. App. 290, 295 (1) (617 SE2d 235) (2005).

---

[9] The Court of Appeals cited no parol evidence that the parties to the contracts understood the term "all participants" to include every person involved in the construction of the terminal, but it found that the language in the statement of purpose was unambiguous in its identification of such persons as intended beneficiaries. *Estate of Pitts*, 312 Ga. App. at 603-604 (1) (a) (i). We do not comment upon the extent, if any, to which parol evidence of record shows that the parties intended "all participants" to include every person involved in the construction of the terminal, but we note that the estate and children contend that deposition testimony shows as much. We leave the question of parol evidence for the Court of Appeals to consider on remand.

Once it ascertained the dictionary definition of "participant," the Court of Appeals determined that the reference in the OCIP addendum to "all participants" unambiguously meant all persons having a part in the construction of the international terminal. That is not an entirely unreasonable understanding of the term, although it does render the phrase that follows "participants" — "involved in the project" — somewhat redundant. See *Floyd v. Floyd*, 291 Ga. 605, 610 (2), n. 8 (732 SE2d 258) (2012) ("[W]henever possible, a contract should not be construed in a manner that renders any portion of it meaningless.") (citation and punctuation omitted). But it is not the only reasonable understanding of that term. Recall that "OCIP" was used by the City and Holder-Manhattan in their contract in two different senses. "OCIP" refers in some places to the entirety of the insurance requirements set out in the OCIP addendum.[10] But in other places, it refers more specifically to the preexisting program by which the City itself procures and maintains the insurance for which it is responsible on construction projects in which it is involved.[11] Participation in that preexisting program is not open to all who have a part in the project, but is limited to contractors and subcontractors, other than mere suppliers, that fulfill the requirements to enroll in OCIP. If "OCIP," as used in the statement of purpose on which the Court of Appeals relied, refers to the preexisting program, rather than the entirety of the requirements set out in the OCIP addendum,

---

[10] For instance, Section 13.2 (1) of the contract provides that "[t]he OCIP is attached hereto as Appendix 'B,' " and the OCIP addendum is entitled "Owner's Controlled Insurance Program."

[11] For instance, Section 13.2 (2) of the contract distinguishes between the OCIP and the insurance to be procured and maintained by Holder-Manhattan and any subcontractors, providing that, "[t]hrough the OCIP and the Construction Manager's Insurance, the parties intend to purchase and maintain all reasonably necessary insurance for the Project." In addition, Section 13.2 (2) provides that, "[i]n the event the [City] fails to maintain the required and necessary OCIP policies, throughout the term of this Agreement, the [City] will be responsible to assume all liability arising from the lack of coverage," referring to those policies for which the City was contractually responsible as "OCIP policies." Section 13.3 (1) appears to distinguish as well between the OCIP and the insurance to be procured and maintained by Holder-Manhattan and any subcontractors, providing:

> [Holder-Manhattan] shall not commence any construction Work in connection with this Agreement until it has fulfilled all its requirements under the OCIP *and* obtained all of the following types of insurance . . . nor shall [Holder-Manhattan] allow any Subcontractor or sub-subcontractor to commence work on its Subcontract until the Subcontractor has fulfilled all its requirements under the OCIP *and* obtained all similar insurance required of the Subcontractor or sub-subcontractors.

(Emphasis supplied.) Section 13.3 (7) also distinguishes between policies procured and maintained under OCIP and those procured and maintained by Holder-Manhattan and its subcontractors, providing that "[a]ll insurance coverage of the [City]'s OCIP policy shall be primary to any insurance or self-insurance program carried by [Holder-Manhattan] applicable to this Project."

it would suggest that "participants" perhaps refers to those who participate in the OCIP program, not all those who participate in the terminal construction project.[12] And no one contends that Pitts was enrolled in the OCIP program. Because it failed to consider the full context in which the reference to "all participants" appeared, the Court of Appeals went astray in its analysis.

Second, even if "all participants" unambiguously includes Pitts, the Court of Appeals also appears to have drawn its conclusion about the extent to which he was an intended beneficiary of the contracts too broadly. It is settled under Georgia law that one not a party to a contract, but who is an intended beneficiary of the contract, may sue "the promisor" for its breach. OCGA § 9-2-20 (b). But in the contracts at issue here, each party to those contracts — the City, Holder-Manhattan, and Archer Western-Capital — was a promisor with respect to some contractual promises and was a promisee with respect to others. And it is perfectly clear that, even if Pitts is an intended beneficiary of the "OCIP," he is not an intended beneficiary of *every* promise contained in the contracts. To determine the extent to which the estate and children properly may sue any one of the parties to these contracts as a "promisor," it is essential to identify the specific contractual promises, if any, of which Pitts was an intended beneficiary, and his rights as an intended beneficiary attach only to those promises. See *Starrett v. Commercial Bank of Ga.*, 226 Ga. App. 598, 601 (1) (486 SE2d 923) (1997) ("Notwithstanding the ultimate purpose of the agreement, individual contract provisions may be intended to benefit a stranger to the contract, thus creating a third-party beneficiary."); accord *Gardner & White Consulting Svcs., Inc.*, 222 Ga. App. 464, 466 (474 SE2d 663) (1996) ("The remedies available to the beneficiary are exactly the same as would be available to him if he were a contractual promisee *of the performance in question.*") (citation and punctuation omitted; emphasis supplied); *Walls, Inc. v. Atlantic Realty Co.*, 186 Ga. App. 389 (367 SE2d 278) (1988) ("[A]lthough the subcontract does contain a provision whereby Walls agreed to indemnify Atlantic, Atlantic would be entitled to enforce *that provision* against Walls if, but only if, Atlantic is a *third-party beneficiary thereof.*") (emphasis supplied).

Consistent with Georgia law, courts in other jurisdictions have observed that "[s]tatus as a third-party beneficiary does not imply standing to enforce every promise within a contract, including those

---

[12] That the preexisting OCIP program is used by the City with respect to other construction projects would explain the phrase "involved in the project" that follows "all participants." That is, the benefit is limited to all OCIP participants that are involved with the construction project at the international terminal.

not made for that party's benefit." *BNP Paribas Mtg. Corp. v. Bank of America*, 778 FSupp.2d 375, 415 (VI) (S.D.N.Y. 2011) (citation omitted). See also *Civix Sunrise, GC, LLC v. Sunrise Road Maintenance Assn.*, 997 So2d 433, 435 (Fla. App. 2008) ("Contrary to the appellees' contention, their status as third-party beneficiaries under paragraphs 3, 13, and 14 does not automatically entitle them to claim fees under paragraph 20."). To the contrary, "a third party beneficiary . . . can only enforce those promises made directly for his benefit." *Clark v. California Ins. Guar. Assn.*, 200 Cal. App.4th 391, 398 (3) (Cal. App. 2011). As the California Supreme Court has explained:

> A third party should not be permitted to enforce covenants made not for his benefit, but rather for others. He is not a contracting party; his right to performance is predicated on the contracting parties' intent to benefit him. As to any provision made not for his benefit but for the benefit of the contracting parties or for other third parties, he becomes an intermeddler. Permitting a third party to enforce a covenant made solely to benefit others would lead to the anomaly of granting him a bonus after his receiving all intended benefit.

*Murphy v. Allstate Ins. Co.*, 553 P2d 584, 588 (Cal. 1976) (citations omitted).[13]

The Court of Appeals appears to have assumed that, if Pitts was an intended beneficiary as a "participant" in the construction project, he was an intended beneficiary for all purposes of every provision of the OCIP addendum, as well as other provisions of the contracts that have some relation to the provisions of the OCIP addendum. See *Estate of Pitts*, 312 Ga. App. at 604-605 (1) (a) (i). But the statement of purpose from which the court ascertained that Pitts was a beneficiary does not say explicitly that the entire OCIP addendum, much less the entire contract, was made for his benefit. Rather, that statement provides that "[t]he purpose of the OCIP is to provide one master insurance program that provides broad coverages with high

---

[13] The dissent criticizes our reliance upon decisions from other jurisdictions. As explained above, these decisions are consistent with Georgia law. And in any event, the dissent notably cannot cite a single case – from Georgia or any other jurisdiction – that refutes the principle that we draw from OCGA § 9-2-20 (b), the Georgia cases, and the persuasive authority from other jurisdictions. The dissent also suggests that looking to specific contractual promises, rather than the contract in its entirety, to assess whether one is an intended beneficiary does not "square with reason [or] the realities of the marketplace." To the contrary, it is the approach of the dissent – that if one is an intended beneficiary of any provision of a contract, he necessarily must be an intended beneficiary of the whole contract – that defies reason and constrains the freedom to contract that marks a free marketplace.

limits that will benefit all participants involved in the project." The question, again, is in what sense does the statement of purpose use the terms "OCIP" and "master insurance program." If "OCIP" and "master insurance program" refer only to the insurance to be provided by the City through OCIP, then Pitts would not necessarily be an intended beneficiary of the provisions that his estate and children seek to enforce about automobile liability insurance to be provided by a subcontractor at its own expense. And even if "OCIP" and "master insurance program" refer more generally to the entire OCIP addendum, Pitts might or might not be an intended beneficiary of provisions in the contracts not specifically related to the OCIP addendum, such as the general provision that Holder-Manhattan bind subcontractors to the terms of its contract with the City. Moreover, Pitts might or might not be an intended beneficiary for all purposes of contractual provisions contained in the OCIP addendum to the extent that those provisions explicitly state that they are to protect "participants" for certain specified purposes.[14] As noted earlier, the Court of Appeals failed to identify the specific contractual provisions of which Pitts was an intended beneficiary and the scope of his rights as an intended beneficiary under those specific provisions, and in so doing, it neglected the settled principle that a third party is entitled to enforce only those specific provisions of a contract of which he is an intended beneficiary.[15]

3. The Court of Appeals also appears to have erred in reaching its conclusion that the City breached its contract with Holder-Manhattan by failing to ensure that A&G Trucking carried automobile liability insurance up to $10 million. First, the court appears to have failed to separately consider the contractual obligations of each of the contracting parties. See *Estate of Pitts*, 312 Ga. App. at 604-605 (1) (a) (i). Instead, it seems that the court conflated the City, Holder-Manhattan, and Archer Western-Capital, notwithstanding that the

---

[14] For instance, the Court of Appeals did not address how the language of the OCIP addendum that requires a subcontractor to provide such automobile liability insurance "as will protect . . . Employees *from* claims [of bodily injury]" (emphasis supplied) can be read to allow such an employee, as a third-party beneficiary of that promise, not only to benefit from insurance to defend *against* a claim of bodily injury from an automobile accident but to *make* such a claim, especially in the light of "the general rule . . . that liability claimants are not regarded as third-party beneficiaries of liability policies[,]" *Crisp Regional Hosp., Inc. v. Oliver*, 275 Ga. App. 578, 583 (4) (621 SE2d 554) (2005) (citation and punctuation omitted), and the separate requirement that the subcontractor provide workers' compensation insurance for its employees, which is the customary way to ensure that employees are *compensated for* their own work-related injury claims, as opposed to being *protected from* claims made against them by third parties.

[15] Again, we do not comment upon the extent, if any, to which parol evidence may properly bear upon this question. We leave that to the Court of Appeals on remand.

City and Archer Western-Capital were not even parties to the same contracts, and notwithstanding that a promise made by one contracting party is not necessarily attributable to another. For instance, the Court of Appeals determined that the contract between the City and Holder-Manhattan "set forth the responsibilities of the City and [Holder-Manhattan] regarding establishing and maintaining the [OCIP]," and it found that "[t]hese responsibilities included the duty to ensure that subcontractors of any tier complied with the minimum insurance requirements of the [OCIP addendum] before working on the construction project."[16] Id. But upon our review of that contract and the OCIP addendum, we find no promise by the City to ensure that subcontractors carried adequate insurance. To the contrary, the contract requires the submission of certificates of insurance to the City, but it expressly provides that "[t]he acceptance by the [City] of any Certificate of Insurance does not constitute approval or agreement by the [City] that the insurance requirements have been satisfied." Only a promisor is liable for breach of contract, see OCGA § 9-2-20 (b), and although the City has argued throughout this case that it is not a promisor with respect to the contractual promises that the estate and children contend were broken, the Court of Appeals failed to fully address that argument.

The City did promise in its contract with Holder-Manhattan to "maintain the required and necessary OCIP policies" and to "procure, pay for and administer the OCIP." The Court of Appeals mentioned these promises in its opinion, but the significance that it attributed to them is unclear. *Estate of Pitts*, 312 Ga. App. at 607 (1) (b). To the extent that the Court of Appeals concluded that the City failed to fulfill these obligations with respect to automobile liability insurance for A&G Trucking, it erred. These obligations plainly refer to the insurance for which the City was responsible and was to bear the

---

[16] Similarly, the dissent conflates the City and the contractors, saying that "the contracts require the City and the defendant companies to take specific actions with regard to the intended insureds, i.e., participants in the construction project, including ensuring that subcontractors of any tier complied with the minimum insurance requirements of the OCIP." Like the Court of Appeals, the dissent cannot identify, however, a single, specific provision of the contract to which the City was a party that imposes any duty upon the City to ensure that "subcontractors of any tier complied with the minimum insurance requirements of the OCIP [addendum]." Both the Court of Appeals and the dissent would hold the City liable for breaking a promise that it never made in the first place. By the way, the estate and children also do not point to a specific contractual promise by the City as a basis for their contention that the City had an obligation to ensure that A&G Trucking had insurance. To the contrary, the estate and children rely upon deposition testimony by representatives of the City as a basis for that contention. The Court of Appeals did not previously address such parol evidence, nor do we. As with other questions of parol evidence, we leave it for the Court of Appeals to address on remand.

expense under the OCIP addendum, but procuring and maintaining automobile liability insurance clearly was the responsibility instead of Holder-Manhattan and any subcontractors.

4. For these reasons, the decision of the Court of Appeals cannot be affirmed.[17] As we have explained, there are important questions in these cases that the Court of Appeals never asked or fully answered. We also note that certain other arguments raised by the parties in the Court of Appeals may bear upon those questions, but also never have been addressed — for instance, the estate and children argue that certain parol evidence properly may be considered in construing the relevant contracts, and they contend that one or more of the defendants has made admissions in judicio that work an estoppel with respect to some of the questions presented in these cases. Because the analysis of the Court of Appeals is incomplete in several respects — and because parol evidence and alleged admissions in judicio that the Court of Appeals never addressed at all may bear upon that analysis — we will not undertake to supply an answer to all the unanswered questions that remain. We express no opinion about whether any party is entitled to summary judgment on this record. Instead, we leave it to the Court of Appeals to supply the answers to the unanswered questions, applying the settled principles of contract law set out in our opinion.[18] The judgment of the Court of Appeals is vacated, and these cases are remanded for further proceedings consistent with this opinion.

*Judgment vacated and cases remanded with direction. All the Justices concur, except Hunstein, C. J., Thompson, P. J., and Hines, J., who dissent.*

---

[17] Having concluded that Pitts was an intended beneficiary of the contract between the City and Holder-Manhattan, as well as the subcontract between Holder-Manhattan and Archer Western-Capital, the Court of Appeals proceeded to consider whether the claims raised by the estate and children are barred by the exclusive remedy provision of the Workers' Compensation Act, OCGA § 34-9-11 (a). See *Estate of Pitts,* 312 Ga. App. at 605-607 (1) (a) (ii). Because we conclude that questions remain about whether, and to what extent, Pitts was an intended beneficiary of those contracts, we do not reach the exclusive remedy question.

[18] We do not leave the Court of Appeals "to wander in the wilderness[,]" (Dissenting Op., p. 237), but instead direct the Court of Appeals to take a specific and well-trod path through the field of contract law. First, that court should decide the meaning of "all participants," considering not only dictionary definitions, but context too. Second, if Pitts was among "all participants," the Court of Appeals then must identify the specific contractual promises of which Pitts was an intended beneficiary and the extent to which he was a beneficiary of those promises. Third, the Court of Appeals must identify the promisor of each such promise and consider whether that promisor has breached that promise. To the extent that parol evidence or admissions in judicio, if any, bear upon these questions, the Court of Appeals may consider them. Finally, if Pitts was, in fact, an intended beneficiary of specific contractual promises that one or more of the defendants breached, the Court of Appeals should consider the applicability of OCGA § 34-9-11 (a) to claims for the breach of those specific promises.

HINES, Justice, dissenting.

I respectfully dissent because contrary to the opinion of the majority, the analysis of the Court of Appeals is neither ill-reasoned nor incomplete. That Court's reversal of the trial court's grants of summary judgment to defendants — the City of Atlanta and companies associated with a construction project at the Atlanta Hartsfield-Jackson International Airport — on breach of contract claims brought by the estate of a worker killed at the construction site, was mandated by the relevant uncontroverted facts of the case and the applicable principles of Georgia contract law. See *Estate of Pitts v. City of Atlanta*, 312 Ga. App. 599 (719 SE2d 7) (2011).

The determinative issue in the litigation is whether the fatally injured worker, Pitts, was a third-party beneficiary to the contracts executed among the City, contractor, and tiers of subcontractors that outlined the rights, responsibilities, and duties of the parties involved in the construction project.

The Main Contract specified that the General Contractor, its subcontractors, and sub-subcontractors (excluding suppliers) were named insureds under the City's "Owner's Controlled Insurance Program" ("OCIP"), which was made part of the contract, and cited again in a contract addendum. Contrary to what is said by the majority, there are not two separate and distinct programs referred to as "OCIP"; it is plain that at most the reference in the addendum is in conjunction with and intended to be part and parcel of the OCIP protections in order to effect its clear purpose. The stated purpose of the OCIP was to "provide one master insurance program that provides broad coverage with high limits that will benefit all participants involved in the project." The Main Contract required that the named insureds comply with all requirements of the OCIP, which explicitly and plainly provided in pertinent part:

> Contractor shall, at its own expense, purchase and maintain . . . such insurance as will protect Contractor, Owner, Construction Manager, Design Consultant, and their Trustees, Directors, Officers, Partners, Agents, Representatives, and Employees from claims of the type set forth below: . . . Automobile, Bodily Injury and Property Damage Liability Insurance covering all automobiles, whether owned, non-owned, leased or hired, with not less than the following limits: . . . Bodily Injury - $10,000,000 per person and occurrence[.]

(Emphasis in original.)

Pursuant to the Subcontract, the Subcontractor agreed to be bound by the terms of the Main Contract, to assume toward the General Contractor all duties and obligations that the General Contractor owed the City under the Main Contract, and to bind all lower tier subcontractors to the obligations set forth in the Main Contract and the Subcontract. The Subcontract expressly required the Subcontractor to maintain automobile liability insurance coverage for "[o]wned, hired and non-owned vehicles with a $10,000,000 combined single limit for bodily injury and property damage."

In order to have a viable breach of contract claim, there must be a breach of the contract at issue and resulting damages to a party who has the right to complain about the contract being violated. *Canton Plaza v. Regions Bank*, 315 Ga. App. 303 (1) (732 SE2d 449) (2012). Thus, the question of the estate's standing to bring this breach of contract action is a threshold inquiry. Certainly, for a third party to have the requisite standing to enforce a contract, it must clearly appear from the contract that it was intended for the benefit of the third party. *Satilla Community Svc. Bd. v. Satilla Health Svcs.*, 275 Ga. 805, 810 (2) (573 SE2d 31) (2002). Thus, the fact that the third party would benefit from performance of the agreement is not in and of itself sufficient. Id. However, for the third-party beneficiary to have standing, it is not necessary that the party be specifically named in the contract, but merely that facially the contract show the contracting parties' intent to benefit the third party. *Boller v. Robert W. Woodruff Arts Center*, 311 Ga. App. 693, 698 (2) (716 SE2d 713) (2011). This focus on intent is in accord with the cardinal rule of contract construction, which is to ascertain the intention of the parties. OCGA § 13-2-3. There is no dispute that Pitts was not mentioned by name in the contracts at issue. So, the question becomes whether such intention to cover workers on the project, like Pitts, can be found on the face of the contracts. And, indeed it can.

As noted, the Main Contract's provision that insureds comply with the requirements of the OCIP expressly mandated that the Contractor was to purchase and maintain insurance, specifically for bodily injury in the amount of $10,000,000 per person and occurrence, for the purpose of protecting various classes of persons involved in the project ranging from the Contractor itself to "Agents, Representatives, and Employees." The fact that the provision uses the language "from claims" of the type set forth does not defeat or diminish the obvious intent to provide insurance protection for individuals who were deemed employees on the project.

In addition, as noted, the OCIP, which was part of the Main Contract and incorporated into the Subcontract, on its face explicitly

and plainly stated that its purpose was to provide a "master" insurance program with "broad coverages with high limits" in order to *benefit all participants* involved in the project." (Emphasis supplied.) Thus, the Court of Appeals correctly examined the term "participant," to determine whether such term also evidenced the intent to include individual workers on the construction site, like Pitts, as a beneficiary of the mandated insurance coverage.

The majority finds that the analysis of the Court of Appeals is incomplete in two respects, the first of which is its determination of the meaning of "participant" because it allegedly "appears to have failed to fully consider the context in which the word appears in the OCIP." But, that is far from the case.

In the situation in which the term "participant" in an insurance policy has not been expressly defined in the policy and has been found to be ambiguous, the appellate court has construed it with the paramount consideration being to effect the intention of the parties. See *Zurich American Ins. Co. of Illinois v. Bruce*, 193 Ga. App. 804, 806 (2) (388 SE2d 923) (1989). In the present case, the intent of the parties is evident from, inter alia, the express statement of purpose to provide encompassing coverage for those involved in the project. Thus, in this case of an unambiguous statement of intent, the Court must look to the contract at issue alone for its meaning and it must be enforced according to its terms. *American Empire Surplus Lines Ins. Co. v. Hathaway Dev. Co.*, 288 Ga. 749, 750 (707 SE2d 369) (2011). And, language which is unambiguous "must be afforded its literal meaning and plain ordinary words given their usual significance." (Citations and punctuation omitted.) *Perkins v. M & M Office Holdings, LLC*, 303 Ga. App. 770, 773 (695 SE2d 82) (2010). Therefore, it was not unfounded for the Court of Appeals to resort to common usage in viewing the term "participant," ("one that participates," and "to participate" means "to take part" or "to have a part or share in something." Webster's New Collegiate Dictionary, p. 829 (1981)), thereby concluding that Pitts was a "participant" in the construction project under the usual significance of that word. The majority acknowledges that it was appropriate for the Court of Appeals to utilize the dictionary definition of "participant" in its analysis in order to obtain a meaning "ordinarily attributed" to that word, but then criticizes such usage on the basis that the dictionary does not "identify the 'something' in which a 'participant' has a part or shares," that is, the context in which the term appears. The majority then states that the context not considered was the contract as a whole, and that the Court of Appeals fell short in this regard because it did not consider "participant" in the "two different senses" that "OCIP" was used in the parties' contracts. The parties utilized the OCIP in

only one relevant sense — to provide an all-encompassing insurance safeguard for participants in the project. Certainly, the argument has been made that the provision in the OCIP, stating that "[t]he [Owner's Controlled Insurance Program] will be for the benefit of the [City] and Contractors and Subcontractors of all tiers," (emphasis omitted), restricts the intended beneficiaries to only those entities. But, again the OCIP was used by the parties in the same and exclusive "sense," that is, to effectuate the parties' purpose and intent that there be one master insurance plan to provide comprehensive coverage for those involved in the project. To construe the contracts' references to "OCIP" differently and possibly at odds with each other violates the basic principle of contract construction expressly cited by the majority — that whenever possible, a contract should not be construed in a manner so as to render any portion of it meaningless. And, as the Court of Appeals observed, the wording at issue does not constitute an express restriction, and to construe the contracts so as to exclude those participants in the construction project who would benefit from insurance coverage would effectively eviscerate the expressed intent that this conceived "master" insurance program benefit all participants in the project. A contract must be considered as a whole with its provisions to be given effect and interpreted so as to harmonize with each other, and any construction that renders portions of the contract language meaningless is to be avoided. *Horwitz v. Weil*, 275 Ga. 467 (569 SE2d 515) (2002).

What is more, even assuming arguendo, that the fact that the contracts do not provide an explicit definition or explanation of the critical term "participant," results in ambiguity about the term, it should be construed in accord with the explicit statement in this case of comprehensive coverage and the general principle that limitations, exceptions, and exclusions in the context of insurance coverage should be narrowly construed because when coverage is affirmatively expressed in broad promises, any limitations on coverage should be defined in clear and explicit terms. *Zurich American Ins. Co. of Illinois v. Bruce*, supra at 806 (2).

The majority next finds fault with the analysis of the Court of Appeals on the basis that even if " 'all participants' unambiguously includes Pitts, the Court of Appeals also appears to have drawn its conclusion about the extent to which he was an intended beneficiary of the contracts too broadly." The majority does not rest with the determination that Pitts is indeed a third-party beneficiary of the contracts, but instead then concludes that the Court of Appeals failed to apply a principle settled under Georgia law that a third party is entitled to enforce only those specific provisions of a contract of which he is an intended beneficiary. It does so first based upon OCGA § 9-2-20

(b), which states merely the general concept that "[t]he beneficiary of a contract made between other parties for his benefit may maintain an action against the promisor on the contract." While this is certainly the law, the majority takes this positive statement of the right to maintain an action, and completely turns it on its head to require that the contracts at issue be dissected in order to determine if Pitts was an intended beneficiary of every provision of the OCIP as referenced everywhere in the contracts including the addendum, as well as every provision of the contracts that relates in any way to the OCIP. And, the Georgia cases cited in support simply do not do so. Indeed, the only credence afforded the majority's position is derived from scarce decisions of foreign jurisdictions. This unauthorized parsing of the contractual provisions at issue potentially renders them at odds so as to violate not only the fundamental precept of interpreting provisions in harmony with each other, but of defeating the protective intent of the insurance mandates. To require that the Court of Appeals, and indeed the original contracting parties themselves, should have examined each phrase in, and indeed, every word of the contracts at issue in isolation in the context of Pitts's rights as a third-party beneficiary is not only unauthorized but is unworkable. The law should square with reason and the realities of the marketplace.

As to concerns of the majority about specificity, the contracts require the City and the defendant companies to take specific actions with regard to the intended insureds, i.e., participants in the construction project, including ensuring that subcontractors of any tier complied with the minimum insurance requirements of the OCIP. Thus, there was a contractual obligation to provide the specific benefit of broad insurance coverage to "a relatively small group of intended beneficiaries," that is, those entities and individuals who were to be participants in the construction project. *Plantation Pipe Line Co. v. 3-D Excavators*, 160 Ga. App. 756, 758-759 (287 SE2d 102) (1981). Pitts was unquestionably a participant in the construction project, and thus, is an anticipated third-party beneficiary of the contracts. His beneficiary status is not altered by any language in the Subcontract expressly excluding as such beneficiaries subcontractors, sub-subcontractors or vendors because he fits none of these classifications. Nor is it diminished or defeated by the general precept that a liability claimant is not considered a third-party beneficiary of an insurance policy because the contracts at issue expressly mandate the contrary determination. *City of Atlanta v. Atlantic Realty Co.*, 205 Ga. App. 1, 6 (3) (421 SE2d 113) (1992) (where construction contract specified that insurance was to benefit plaintiff, plaintiff was a

third-party beneficiary entitled to judgment on breach of contract claim for failing to acquire and maintain insurance).

Throughout, the majority refers to parol evidence, and implicitly chastises the Court of Appeals for incompleteness on the basis that it did not address certain arguments of the parties dependent, at least in part, on consideration of parol evidence. But, this is a case of unambiguous contract provisions and the breach thereof, and a resort to parol evidence is unwarranted and unauthorized.

The majority also incorrectly refuses to address the propriety of the Court of Appeals' determination that the exclusive remedy provision of the Workers' Compensation Act ("the Act") does not bar Pitts's estate from seeking damages for breach of the contracts at issue. As explained such provision states that

> [t]he rights and the remedies granted to an employee by [the Act] shall exclude all other rights and remedies of such employee, his personal representative, parents, dependents, or next of kin, at common law or otherwise, on account of such injury, loss of service, or death.

OCGA § 34-9-11 (a). But, this exclusive remedy does not prevent a party from pursuing an action for damages resulting from injuries which are not contemplated by the Act. *Bright v. Nimmo*, 253 Ga. 378, 379-380 (320 SE2d 365) (1984). In fact, OCGA § 34-9-11.1 (a) provides:

> When the injury or death for which compensation is payable under [the Act] is caused under circumstances creating a legal liability against some person other than the employer, the injured employee or those to whom such employee's right of action survives at law may pursue the remedy by proper action in a court of competent jurisdiction against such other persons, except as precluded by Code Section 34-9-11 or otherwise.

This is precisely such a situation. The estate seeks damages, not for a physical injury as is contemplated by the Act, but rather loss of access to insurance coverage because of the defendants' alleged breach of contract. The estate is merely attempting to obtain a remedy for this injury which is distinct from the one for which it has obtained a judgment against A&G Trucking in a separate action for damages for Pitts's death from the physical injuries he sustained. See

*Superb Carpet Mills v. Thomason*, 183 Ga. App. 554 (359 SE2d 370) (1987). Simply, the Act is not applicable to the estate's breach of contract action.

In sum, the focus of the majority is the found need for the resolution of questions which are irrelevant, as matters of fact or law, to the determinations necessary to decide the appeals, and thus, it inexplicably strains to return these cases to the Court of Appeals. It then orders that Court to reconsider the litigation in a manner consistent with the majority's opinion, which unfortunately, effectively directs the Court of Appeals to wander in the wilderness.

I am authorized to state that Chief Justice Hunstein and Presiding Justice Thompson join in this dissent.

DECIDED NOVEMBER 27, 2012.

*Casey Gilson, Robert P. White*, for Archer Western Contractors, Ltd. et al.

*Carlton Fields, Walter H. Bush, Jr., Christopher B. Freeman, Sylvia H. Walbolt, E. Kelly Bittick, Jr.*, for Holder Construction Company et al.

*Swift, Currie, McGhee & Hiers, Steven J. DeFrank, Stephen M. Schatz, Bradley S. Wolff*, for City of Atlanta.

*Butler, Wooten & Fryhofer, James E. Butler, Jr., Joel O. Wooten, Jr., Kate S. Cook, McDonald, Cody & Cook, Matthew E. Cook, Davis, Pickren, Seydel & Sneed, James Patrick M. Sneed*, for Estate of Mack Pitts.

*Hendrick, Phillips, Salzman & Flatt, David R. Hendrick, William D. Flatt, Smith, Currie & Hancock, Philip E. Beck, Kirk D. Johnston, Gerald S. Walters, McKenna, Long & Aldridge, James R. Evans, John S. Berry*, amici curiae.