**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT.  ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**June 30, 2021**

# In the Court of Appeals of Georgia

A21A0394. GLOBAL PAYMENTS DIRECT, INC. v. FRONTLINE PROCESSING CORP.

BARNES, Presiding Judge.

After the termination of fee agreements between Frontline Processing Corporation and Global Payments Direct, Frontline filed suit in Dekalb County alleging, among other things, breach of the agreements. A Dekalb County jury returned a verdict of $135,200,191.29 to Frontline against Global Payments Direct, Inc. The award represented $109.8 million in consequential damages, $24.3 million in direct damages, and $1,071,923.43 in attorney fees pursuant to OCGA § 13-6-11. Global now appeals from that judgment and contends that the consequential and direct damages awards should be vacated and that the trial court erred in denying its directed verdict motions on several breach of contract claims, specifically breach of

the non-solicitation, confidentiality and coordination provisions. For the reasons discussed below, we reverse.

On appeal, we examine the record in the light most favorable to the verdict and judgment. *Horan v. Pirkle*, 197 Ga. App. 151, 153 (2) (397 SE2d 734) (1990). A jury verdict, after approval by the trial court, will not be disturbed on appeal if it is supported by any evidence. Id.

Viewed in that light, the record reveals that from 2001 until 2015, Global, an electronic payment processing company,[1] and Frontline, an independent sales organization ("ISO"), had a contractual relationship under which Frontline solicited, prescreened, and referred merchants to Global for use of Global's electronic payment processing services. If accepted by Global, the merchants would enter into a Card Services Agreement with Global, and Frontline would receive residual payments from the merchants. Global and Frontline's relationship was established and controlled by the Merchant Service Agreement ("MSA") and the Referral Agreement ("RA") (this agreement included the two companies and a third-party bank – HBSC and later Wells Fargo).

---

[1] Global was formerly known as National Data Payment Systems, and the contract between Frontline and Global was amended in 2003 to reflect the corporate name change.

2

In 2013, VISA excluded debt collectors from its credit criteria, and thus those merchants could no longer process debt payments with VISA. That same year, Frontline referred two debt collectors to Global– Credit Power and UDPS. According to Frontline, although required by the terms of the MSA, Global withheld the information about VISA's policy, and Frontline was unaware of the debt collectors prohibition when it screened Credit Power and UDPS and submitted the underwriting and relevant documentation to Global for the company's approval. Despite the restrictions, Global accepted the merchants.

In 2015, the Consumer Financial Protection Bureau ("CFPB") commenced a regulatory action against several defendants in federal court, including Global and Frontline for violations of the Consumer Financial Protection Act. Frontline contends that Global's acceptance of the debt collectors as merchants resulted in Frontline and Global's involvement in the CFPB action. The federal court ultimately dismissed the CFPB's claims against Frontline with prejudice.

Claiming that it had a right to indemnification under the MSA, Global withheld its litigation fees associated with the federal action from sales fees owed to Frontline. Frontline's lawsuit was filed in early June of 2015, and initially only disputed

3

Global's withholding of the sales fees.[2] But in late June of 2015, Global informed Frontline that it was terminating the Agreements between the two companies, effective October 2015. Subsequently, Frontline amended its complaint to allege additional claims including that Global breached the MSA. .

At trial, Frontline presented evidence of a deteriorating relationship between the two companies, including that Global locked Frontline out of its vendor system, which prevented Frontline from working with its referred merchants, and that Global also refused to assign Frontline's rights under the Agreements so that Frontline could move to another credit processing company. Frontline's CEO, Christopher Kittler, testified that Global refused to cooperate with the assignment of its merchants to prevent Frontline from servicing its merchants because by "blocking the transfer [and] the merchant reserves[,] [t]he merchants aren't going to move anywhere without the reserves." Kittler attributed the strained relationship to Global's changing business model in which it shifted from a credit card processor to a competitor, as it purchased companies that offered the same services as its referral partners like Frontline. He also recalled a shifting attitude as Global "wouldn't resolve issues.

---

[2] Global asserted counterclaims for breach of contract, indemnification, and attorneys' fees.

They wouldn't provide training. They wouldn't cooperate." Kittler testified that the lack of revenue and operating capital caused by Global's actions resulted in Frontline's near financial collapse as the company experienced "enormous layoffs," lost sales, decreased revenue, and the inability to partner with new credit processing companies. The result, Kittler testified, was that Global destroyed Frontline's credibility and "wiped out the value of [Frontline]."

At trial, as to damages, Frontline's expert, Jonathon January, calculated that Frontline had actual or direct damages of $23.4 million dollars which reflected the company's lost income from December 31, 2014 – the starting point of the company's decline – through January 2019.[3] January testified that to select a starting date for the calculation of Frontline's actual damages he "looked at the company from the beginning and kind of the process period. And then based on the facts as presented in the case to determine when did things begin to change. And that date was determined to be . . . December 31st, 2014, which is the end of the accounting cycle[.]" He testified that the company was doing "quite well" in the period before 2014 and had an "excellent operating history." In the four-year period prior to 2014,

---

[3] January was permitted to reference the Frontline damages analysis he prepared prior to trial. The report was not allowed to go out with the jury in its deliberations.

5

Frontline had "achieved approximately 21 percent compounded growth rate in its gross profit during that time." January explained that he had used Frontline's net income of $2,661,000, $2,494,000, and $2,607,000, respectively for the years 2012-2014 and calculated that if the company had continued experiencing growth at the same rate, its earnings would have increased each year, with total lost profits of $23.4 million, given an interest rate of 7 percent.

In regard to the consequential damages, to calculate the value of Frontline as a stand alone ISO as of 2014, January "look[ed] at the value it would be given by a third party acquirer." He modeled the hypothetical acquisition of Frontline using as a comparison the 2016 acquisition of Heartland Processing Corporation by Global for $4.3 billion. According to January, although Hearltland was much bigger than Frontline, they were similar in companies in their business model and target market. January used Heartland's 2014 earnings before interest, taxes, depreciation and amortization ("EBITDA") of $121,094,00 and divided the acquisition price of $4.3 billion by that figure to arrive at a multiplier of 35.51. He then multiplied Frontline's EBITDA of $2,636,894 by the 35.51 multiplier and estimated the 2014 value of Frontline at $93,600,596. To arrive at the value of Frontline as of 2019, January used that same method and, multiplying the company's much smaller EBITDA by the

6

35.51 multiplier, valued the company at $12,827,881. He then subtracted that value from the 2014 value, arriving $109,863,407 in calculated damages based on a hypothetical acquisition of Frontline.[4] January testified that the comparisons in Frontline's 2014 value as opposed to its current value was "a tale of two companies where you have a company that was just coming out and taking off and then just through this process got obliterated. . . [T]he twelve million valuation was consistent, but I think it's quite high. Nobody would pay that today for Frontline." He characterized Frontline as a "zombie company," and testified that "in the prior five years, they made over 15 million. In the last five years, its barely made . . . half a million at most . . . barely getting by. . . . [A]ll the attributes they had and all the assets they previously had that you'd use to value it were essentially gone."

Following deliberations, the jury found for Frontline. The verdict form reflected, in relevant part, as follows:

1.      Did Global breach Section D of the MSA "Compensation"?

        a. Answer          *Yes__✓___ or No_____*

2.      Did Global breach Section F(4) of the MSA "Merchant Agreements:

---

[4] In his report, January also posited an alternative valuation methodology based on the damage to Frontline's merchant portfolio, under which the estimated consequential damages were calculated at $85,897,825.

Assignment of Merchant Agreement"?

    a. Answer          *Yes__✓___ or No _____*

3.     Did Global breach Section L of the MSA "Indemnity and Limitation of Liability"?

    a. Answer          *Yes __✓__ or No ____*

4.     Did Global breach Section C of the MSA "Merchant Retention"?[5]

    a. Answer          *Yes _✓___ or No ____*

5.     Did Global breach Section G of the MSA "Confidentiality"?

    a. Answer          *Yes __✓__ or No ____*

6.     If you answered "Yes" to any of the Questions above, what direct damages do you award Frontline?

    *$ 24,328,267.86*

7.     If you answered "Yes" to Questions 4 and 5, what consequential damages do you award Frontline?

    *$ 109.8 M*

The jury also awarded Frontline attorneys fees pursuant to OCGA § 13-6-11 of $1,071,093.43, and rejected Global's counterclaims against Frontline for breach

---

[5] This breach is presumably referring to the non-solicitation provision.

of the MSA's "Indemnity and Limitation of Liability" provision, breach of the RA's "Indemnity" provision, and attorneys fees.

1. Global contends that the trial court erred in denying its motions for directed verdict of Frontline's claims for breach of certain contractual provisions contained in the MSA.[6] Global argues that Frontline failed to adduce any evidence of such breaches and thus it was entitled to directed verdicts of the breach of solicitation claim, the breach of confidentiality claim, and the breach of the coordination (assignment) claim.

"The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." (Punctuation omitted.) *Norton v. Budget Rent A Car System*, 307 Ga. App. 501, 502 (705 SE2d 305) (2010). "A directed verdict is proper only where there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict." (Citations and punctuation omitted.) *Heyde v. Xtraman, Inc.*, 199 Ga. App. 303, 305-306 (2) (404 SE2d 607) (1991).

---

[6] The trial court also denied Global's challenge to the claims in its earlier motion for summary judgment. The order did not provide any explanation for the denial.

9

a. Global first contends that the trial court erred in denying its motion for directed verdict on the breach of the non-solicitation provision in the MSA. In asserting such error, Global maintains that Frontline did not prove that Global actually solicited merchants or that Frontline was damaged by any alleged solicitation.

> Section C of the MSA provides that Global
>
> agrees not to directly, knowingly, or actively solicit any merchant business which is receiving card processing services through a service agreement with the other party. This restriction is binding upon the individual signing this Agreement on behalf of ISO as well as the ISO.

In its complaint, as amended, Frontline claimed that Global "breached the Frontline MSA by directly, knowingly, and actively soliciting merchant business from merchants who already had agreements with Frontline." To support its claim for breach of the non-solicitation provision, Frontline presented evidence that Global locked Frontline out of its vendor system (which barred Frontline from accessing the merchants it had referred), refused to transfer merchant reserve monies, and impeded Frontline from moving to another payment processing company. According to Frontline, Global's actions had effectively seized Frontline's merchants for itself. This conduct, Frontline contends, evinced Global's increasing posture as Frontline's

10

competitor, and the jury thus could have found "that Global's elimination of the tripartite relationship [between Frontline, Global, and the merchants] amounted to solicitation."

In moving for a directed verdict, Global argued that there was "no evidence anybody left Frontline or that Frontline was cut out that came over to Global." It further argued that

> there is absolutely no evidence of damages on the non-solicitation claim in this case. The only other thing you heard is vague passing references that Global removed Frontline from its MAS system. . . . [T]hat's not solicitation; that's just saying you can't go on our system. But that has nothing to do with actively soliciting anybody.

Frontline responded that for Global to breach the non-solicitation provision of the MSA, the merchants did not have to come over to Global.

> Nothing had to change in order for them to be solicited by Global. . . . It's not that anyone called these merchants. The problem is that Global violated the non-solicitation provision by cutting Frontline out. By taking Frontline's money. By denying Frontline access to the merchant reserves, by locking Frontline out of the system. You do all of that, they're no longer Frontline merchants. They're Global merchants.

The result, Frontline argued, was that Global "effectively used its power to turn these merchants into Global merchants and thereby improperly solicited them."

The trial court denied the motion for directed verdict, and noted that although it was a "close question,"

> it's an issue for the jury . . . I guess it's some type of constructive solicitation . . . [T]he only way I can grant a motion for directed verdict is that the evidence is so clear that by any interpretation of the evidence . . . you're absolutely entitled to a judgment in your favor. And I think there is a muddy area there and I don't think it's so clear that I can grant a motion for a directed verdict.

Global asserts on appeal that the MSA prohibits parties only from "directly, knowingly or actively" soliciting the merchants, and that there was no evidence at trial that Global made a "direct, knowing, or active sales pitch to any Frontline merchant." It contends that the conduct cited by Frontline– shutting Frontline out of its vendor system, refusing to transfer merchant reserve monies, or declining to process the papers so that Frontline could transfer its merchants to another processor – do not constitute direct, knowing, or active solicitation under the MSA.

12

Alternatively, Global contends, under the standard rules of contract construction, the non-solicitation provision in the MSA does not apply, as a matter of law, to the facts here. According to Global, the non-solicitation provision of the MSA states that Global and Frontline agree not to solicit any merchant business that is receiving card processing services "through a service agreement with the other party." It argues that Frontline's assertion that the MSA was itself a "service agreement" under the non-solicitation provision contradicts the express terms and intent of the MSA. The term "Agreement" as used in the MSA denotes the whole instrument, Global argues, which binds Frontline and Global, as distinguished from the term "service agreement," which refers to the contracts between Global and the merchants. Noting that pursuant to OCGA § 13-2-3, the contract terms must be considered together, Global asserts that had the non-solicitation provision referred to the Agreement between Global and Frontline, it would have specifically used that term instead of "service agreement." It points to the evidence at trial establishing that Frontline was not a party or signatory to any service agreements with any of the merchants for card processing services. Global further notes that Frontline sold Global's services to the merchants, and thus the "service agreements" were only between Global and the merchants.

13

In response, Frontline points out that "solicitation has no fixed meaning under Georgia law," and that the jury was presented with references to the clause in context with the evidence and thus necessarily concluded that the evidence supported that Global breached the non-solicitation provision. It further rejects Global's argument that a directed verdict as to that claim was appropriate because as Frontline did not have a service agreement with Global, it could not solicit merchants receiving processing services "through a service agreement with the other party." Frontline maintains that the trial court correctly recognized that the MSA is, in fact, a service agreement given that all of Frontline's referred merchants entered into a service agreement with Global.

Ordinarily, words in a contract are given their usual, common meaning. See *Unified Government of Athens-Clarke County v. McCrary*, 280 Ga. 901, 903 (635 SE2d 150) (2006) (holding that "language used [in contract] must be afforded its literal meaning and plain ordinary words given their usual significance"). And, except when considering a technical term or term of art in a particular industry, Georgia courts often begin by considering how a word has been defined in dictionaries to determine its plain and ordinary meaning. *Catoosa County v. Rome News Media*, 349 Ga. App. 123, 128 (825 SE2d 507) (2019). See *McMurray v. Bateman*, 221 Ga. 240,

14

253 (2) (144 SE2d 345) (1965) (not necessary that the contract define words that are commonly used in connection with the conduct of business or the practice of professions.)

As most relevant here, Black's Law Dictionary (7th Ed. 2004) defines solicit as "[a]n attempt or effort to gain business." See *Archer W. Contractors, Ltd. v. Estate of Pitts*, 292 Ga. 219, 224 (2) (735 SE2d 772) (2012) (explaining, in the context of construing a contract, that a dictionary is a useful tool for narrowing the range of meanings ordinarily attributed to a word and looking to dictionaries for accepted definitions of a word is "a good place to start"). While this Court has not adopted a definitive definition of "solicitation," in *Chattanooga Glass Co. v. Strickland*, 244 Ga. 603 (261 SE2d 599) (1979), our Georgia Supreme Court has recognized three definitions utilized or adopted by other jurisdictions:

> (1) the specific act of asking a customer to purchase ones' product; (2) any act which leads to the purchase of one's product as opposed to acts which follow from the purchase; and (3) any act which leads to or follows from the purchase so long as said act is incidental to the purchase.

15

(Citations omitted.) Id. at 604 (2) (The Court applied the latter to find that the appellant's activities of purchasing raw materials was beyond the scope of the definition of solicitation.)

The non-solicitation provision at issue here prohibits "directly, knowingly, or actively" soliciting the merchants who are already receiving services through a service agreement with either Global or Frontline. Even if Global's conduct could be characterized, as found by the trial court, as a type of "constructive solicitation" because its actions impacted Frontline's access to its referred merchants, such a strained interpretation of the conduct ignores not only the plain language of the non-solicitation's prohibition against direct, active, or knowing solicitation, but also the common meaning of the term. While the alleged conduct – shutting Frontline out of Global's vendor system, refusing to transfer merchant reserve monies, or delaying the processing of paper work to transfer Frontline's merchant's to another vendor– may have impacted the MSA's provisions regarding the portability of Frontline's merchants, we cannot say such conduct equates to solicitation as it is commonly understood in the ordinary course of conducting business. Moreover, if the provision intended to foreclose any indirect, consequential or latent solicitation, it would have stated so. Viewing the evidence in a light most favorable to appellee, we find that the

16

evidence did not support Frontline's claim that Global breached the non-solicitation provision in the MSA. Thus, the trial court erred in denying Global's motion for directed verdict as to this claim.

b. A directed verdict was also indicated on Frontline's breach of the MSA's confidentiality provision. Section G of the MSA provides in relevant part that

> [t]he parties agree that the terms of this Agreement, as well as all information of a business nature relating to the business operations of the parties and customer information, which are disclosed in connection with this agreement are confidential.

In moving for a directed verdict of that claim, Global argued that the only evidence that Frontline introduced in relation to the breach of confidentiality claim was that Global had attached the MSA to a court filing in the CFPB case. Significantly, it argued, there was no evidence that anyone looked at the filing, or that if anyone saw the document in the CFPB case, it resulted in any actionable damages to Frontline.

Frontline responded that it was uncontroverted that the MSA was not filed under seal with Global's federal court filing, and that there was evidence that Frontline had suffered damages because Global's public treatment of Frontline in the

17

CFPB lawsuit had resulted in significant damages. The trial court agreed and denied the motion.

On appeal, Global contends that there was no evidence that anyone other than the parties to the federal litigation knew about the terms of the MSA agreement, that anyone saw the document, or that Frontline suffered damages because of the alleged breach. Frontline asserts that Global admitted that it filed the confidential MSA in the federal litigation, and that there was corresponding testimony "that the public airing of the dispute caused reputational damage and economic harm." It further asserts that "testimony from Kittler was that those public disclosures, as well as corresponding actions Global disingenuously took in the CFPB litigation, directly harmed Frontline's reputation, business standing, and ability to procure other processing services or merchant clients."[7]

Pretermittiing whether, as asserted by Frontline, attaching the MSA to the federal court filing was a breach of the confidentiality provision, we note that to

---

[7] Frontline does not, however, cite to this testimony in its appellate brief. We remind the parties that our rules require appellants and appellees to provide "citations to material parts of the record or transcript." See Court of Appeals Rule 25 (a), (b). It is particularly important where, as here, there is an extensive record which includes several days of trial testimony. This Court will not cull the record on behalf of either party. See *Fortson v. Hotard*, 299 Ga. App. 800, 801 (1) (684 SE2d 18) (2009).

18

prevail on the claim, Frontline must also prove "damage proximately caused by the breach." *Wells Fargo Bank v. Cook*, 332 Ga. App. 834, 842 (1) (b) (775 SE2d 199) (2015). See *Corrosion Control v. William Armstrong Smith Co.*, 157 Ga. App. 291, 292 (277 SE2d 287) (1981) ("In a suit for damages for breach of contract, the plaintiff must allege and prove both the breach and the damage. . . .").

As claimed by Frontline, "many witnesses testified that the public airing of the dispute caused reputational damage and economic harm." Indeed, at trial, Kittler testified extensively about how the accusations made by the CFPB in the federal lawsuit "cost Frontline its hard-earned reputation," and "its ability to ever prosper in this business again." Former Frontline employee, Mark Wilson also testified about the impact of the lawsuit and recalled that "after the CFPB lawsuit was in the public, no one would do business with us. They wouldn't talk to us . . . . They wanted nothing to do with it, wanted nothing to do with Frontline." Neither witness however, testified about any damages associated with the disclosure of the MSA. Nor does Frontline note any witness testimony or evidence that any of the alleged reputational damage or business loss resulted from the MSA being attached to a Global filing in the CFPB lawsuit, such as public disclosure of the terms contained within. The evidence put forth by Frontline instead only related to the negative impact on

19

Frontline's reputation and business resulting from Global's accusations against Frontline in the CFPB lawsuit. The evidence did not demonstrate that the inclusion of the MSA to a filing in that lawsuit was consequential to the damages alleged by Frontline for the alleged breach of this provision.

Accordingly, the trial court erred in denying Global's motion for directed verdict of Frontline's claim for breach of the MSA's confidentiality provision.

c. Global also contends as error the trial court's denial of its motion for directed verdict of Frontline's claim for breach of the MSA's coordination provision. Section F (4) of the MSA provides, in relevant part, that

> [Frontline] may instruct [Global] and [Global] hereby agrees that it will assign all of its rights and obligations in all or an identified segment of the Merchant Agreements to another transaction processor designated by [Frontline], and will coordinate with the member bank for the purpose of requesting its assignment of its rights and obligations under the subject Merchant Agreements to another member bank designated by [Frontline], conditioned upon the execution of novation(s) by all interested parties to effect a full and final release of [Global] and the member bank from each assigned Merchant Agreement, such novation(s) and release(s) to become effective on the effective date of the assignments, and subject to any other conditions or requirements of the member bank.

Global contends that breach was not established as to this provision because Frontline did not satisfy the condition precedent of obtaining novation prior to any transfer of the merchants. This failure, according to Global, relieved Global of its duty to coordinate, such that there was no breach of the provision. Frontline maintains that its request to transfer the merchants in 2014 was a *requested* novation per the terms of the provision, and that it was followed by inaction from Global. The evidence in this case shows that, as argued by the Frontline, in 2014, it requested assignment of the merchants as required by the MSA, and that Global did nothing for over a year, during which time Frontline had no access to its referred merchants with Global. Moreover, arguably Global waived its right to raise a novation defense by ultimately consenting to the assignment of Frontline's merchants. "[A] waiver of conditions precedent can be implied by the conduct of the parties." *Royal Atlanta Dev. Corp. v. M. D. Hodges Enterprises*, 141 Ga. App. 838, 838 (1) (234 SE2d 676) (1977).

"[T]he question of the parties' mutual intention for an accord and satisfaction or novation is ordinarily a question of fact reserved for jury determination." *Feely v. First American Bank of Ga., N.A.*, 206 Ga. App. 53, 56-57 (2) (a) (424 SE2d 345)

21

(1992).[8] Same *Mayer v. Turner*, 142 Ga. App. 63, 64 (234 SE2d 853) (1977); *State Mut. Ins. Co. v. Strickland*, 218 Ga. 94 (1) (126 SE2d 683) (1962) (finding that existence or not of mutual intention is ordinarily a question of fact which is reserved for determination by the jury). As previously noted, denial of a motion for directed verdict is not improper when the evidence does not demand a particular verdict. See OCGA § 9-11-50 (a). It cannot be said that the evidence here demanded a directed verdict on Global's breach of the coordination/assignment provision. Denial of Global's motions for a directed verdict was therefore not error.

2. Although the damages were apportioned as actual and consequential, we cannot determine what damages are attributable to the breach of the non-solicitation or confidentiality provisions. Therefore, our reversal of the trial court's denial of the directed verdict of the two claims necessitates a new trial on the remaining claims.

---

[8]As we have explained:

In every novation there are four essential requisites: (1) a previous valid obligation, (2) the agreement of all the parties to the new contract, (3) the extinguishment of the old contract, and (4) the validity of the new one. If these essentials, or any one of them, are wanting, there can be no novation.

(Citation and punctuation omitted.) *Brown v. Lawrenceville Properties*, 309 Ga. App. 522, 524 (1) (710 SE2d 682) (2011).

22

See *Bowdish v. Johns Creek Assoc.*, 200 Ga. App. 93, 97 (5) (406 SE2d 502) (1991) (damages awarded by jury were not apportioned between two claims; thus the reversal of the court's grant of directed verdict as to one claim necessitates a new trial since there is no way to determine which, if any, damages are attributable to the reinstated claim); OCGA § 9-11-50 (e) (When this Court determines that a directed verdict was erroneously denied, it "may order that a new trial be had, as the court may determine necessary to meet the ends of justice under the facts of the case.").

3. Global challenges the consequential and direct damages awarded to Frontline. Global contends that the calculation of consequential damages by Frontline's expert resulted in purely speculative damages that were not traceable to Global's conduct, and that the direct damages award suffered from the same shortcoming in that they were not directly tied to the alleged breach of the contract. In light of our resolution of this case, these contentions are moot, and thus it is unnecessary to address these enumerations of error.

*Judgment reversed. Gobeil and Markle, JJ., concur.*