**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0364
STATE OF GEORGIA et al.

v.

FEDERAL DEFENDER PROGRAM, INC. et al.

On Appeal from the Superior Court of Fulton County
No. 2022CV364429

Argued: March 18, 2026 — Decided: June 2, 2026

McMILLIAN, Justice.

Virgil Delano Presnell, Jr., has been on Georgia's death row for decades.[1] After an execution order issued for him in April 2022, the Federal Defender Program, Inc. ("Federal Defender"),[2] filed an action for breach of contract on its own behalf against the State of Georgia and Christopher M. Carr in his official capacity as Attorney General (collectively, the "State"), claiming that the State breached an agreement about the timing and procedures that the State would follow in resuming executions for certain

---

[1] See *Presnell v. State*, 274 Ga. 246 (2001), cert. denied, 535 US 1059 (2002).

[2] The Federal Defender is a domestic non-profit corporation whose Capital Habeas Unit represents death row inmates in federal post-conviction proceedings and in state clemency proceedings. Presnell and the Georgia Appellate Practice and Educational Resource Center, Inc., a domestic non-profit corporation whose attorneys represent death row inmates in state habeas proceedings and in state clemency proceedings, later moved to intervene in the lawsuit, which was granted. We refer to these three collectively as the "Appellees."

death row inmates after the COVID-19 pandemic (the "Agreement"). In a prior opinion, this Court held that the Agreement was valid and enforceable and that the trial court did not abuse its discretion in granting an interlocutory injunction, which prohibited the State from pursuing execution orders for inmates covered by the Agreement and which effectively stayed Presnell's execution.[3] *State v. Fed. Defender Program, Inc.*, 315 Ga. 319, 355 (2022) ("*Federal Defender I*").

The matter now returns on direct appeal from the trial court's grant of partial summary judgment, concluding that one Agreement condition—that is, whether COVID-19 vaccines are "readily available to all members of the public" (the "Vaccine Condition")—has not been met because vaccines are not approved by the U.S. Food and Drug Administration ("FDA") for children under six months old. Based on this conclusion, the trial court permanently enjoined the State from resuming certain executions until the conditions and notice requirements of the Agreement are met. The State contends that, in granting partial summary judgment to the Appellees and in denying partial summary judgment to the State, the trial court erred by: (1) failing to apply the Agreement's plain language and, instead, substituting a requirement that the Vaccine Condition is not satisfied until the FDA approves COVID-19 vaccines for children under six months old; (2) interpreting the Vaccine Condition in a manner that results in an indefinite contract; and (3) imposing an overly broad injunction that goes beyond the scope of the Agreement.

We conclude that the trial court erred in construing the Vaccine Condition, and that when correctly construed according to its plain language, the undisputed evidence shows no genuine

---

[3] The interlocutory injunction has since remained in place.

2

issue of material fact about the condition's satisfaction. So we reverse and remand for further proceedings.

1. The facts are set out in detail in *Federal Defender I*, but briefly, in that case we held that an e-mail exchange between a deputy attorney general and an attorney employed by the Federal Defender and other capital defense attorneys constituted a written contract about the timing and procedures that the State would follow in resuming executions for certain death row inmates after the COVID-19 pandemic. See 315 Ga. at 344. That email exchange, in relevant part, stated as follows:

> Our office will not pursue an execution warrant from the District Attorney in the below defined cases before: 1) the final COVID19 judicial emergency order entered by the Chief Justice of the Supreme Court of Georgia expires;[4] 2) the Georgia Department of Corrections lifts its suspension of legal visitation, and normal visitation resumes; and [3)] a vaccination against COVID19 is readily available to all members of the public.

Id. at 321. It further stated that:

> the "agreement applie[d] only to death-sentenced prisoners whose petition for rehearing or rehearing en banc was denied by the Eleventh Circuit while the State of Georgia remained under judicial emergency order" and that, with one named exception, the Attorney General's office agreed "not [to]

---

[4] The judicial emergency order was first issued on March 14, 2020, and expired after 15 extensions on June 30, 2021. See *Federal Defender I,* 315 Ga. at 320 n.3. In the prior appeal, the Appellees conceded that this condition has been met. See id. at 322.

> pursue an execution warrant of any prisoner ... before a total of at least six months after the time the above-three conditions [we]re met."

Id. (original internal footnote omitted). The email exchange concluded by stating that "the agreement was 'made with the understanding that the District Attorney maintain[ed] the sole authority to obtain an execution warrant.'" Id.

After the trial court granted an interlocutory injunction precluding the State from pursuing executions of inmates covered by the Agreement, concluding that the conditions in the Agreement had not been met, the State, on appeal, argued in relevant part that it had substantially complied with the Agreement's terms and that the trial court erred in granting the interlocutory injunction because "multiple FDA-approved vaccines have been 'widely available' since the winter of 2020" and the trial court's "'extreme interpretation' of the term 'all members of the public' as including children under five years of age is contrary to the 'substantial compliance' rule." *Federal Defender I*, 315 Ga. at 351. However, we disagreed with the State's position, concluding that "the Agreement's plain language, drafted by the State, places no limitation on the age of who is considered a member of the public." Id. We further concluded that, because the Agreement was entered in April 2021, regardless of the level of vaccine availability in the winter of 2020, it could not have been what the parties intended to satisfy the Agreement. Id.

After this Court affirmed the trial court's interlocutory ruling, the parties agreed to litigate the remaining issues separately, starting with the Vaccine Condition.[5] After discovery, the parties

---

[5] The Agreement's condition regarding inmate visitation has not yet been litigated.

4

cross-moved for partial summary judgment. In its motion, the State argued that the Vaccine Condition has been met, and in the alternative, that the condition had been substantially complied with since March 2023, which is when the Fulton County Superior Court lifted its COVID-19-related restrictions after recognizing that "vaccines are now available to all Georgians," and when vaccines became "readily available" to all persons six months old and older who are eligible to receive a COVID-19 vaccine. Lastly, the State argued that the Agreement's purpose has been fulfilled because the capital defense bar has had years to accommodate the pandemic-created backlog of execution-eligible inmates; the State has since executed one death row prisoner who had a full clemency hearing;[6] and that, since March 2023, the work of the Federal Defender and the Georgia Appellate Practice and Educational Resource Center, Inc., on behalf of death row prisoners has not been hindered due to COVID-19. Conversely, in their motion, the Appellees argued that the State breached the Agreement by seeking Presnell's execution order when COVID-19 vaccines were then-unavailable to children under five years old and without giving adequate notice. The Appellees further claimed that the Vaccine Condition has not been met because the FDA has not approved COVID-19 vaccines for children under six months old. In support, the Appellees pointed to their epidemiology expert's affidavit, swearing that, due to not having FDA-approval, "medical

---

[6] In early 2024, the State obtained an execution order for death row inmate Willie Pye. Pye moved to intervene in this action, claiming that he was an intended third-party beneficiary to the Agreement, and, as such, his execution should also be enjoined. The trial court disagreed, concluding that Pye did not fall within the class of prisoners covered by the Agreement. Pye's clemency hearing was then held before the State Board of Pardons and Paroles with multiple witnesses in attendance in March 2024. Pye was denied clemency and subsequently executed.

and pharmaceutical providers cannot provide the vaccine to children in this age range due to the lack of a label indication and differences in dosing amounts for different age groups."

After the evidentiary hearing, the trial court denied the State's motion for partial summary and granted the Appellees' cross-motion for partial summary judgment. Specifically, the trial court granted the Appellees specific performance of the Agreement and ordered the State to perform the Agreement according to its terms; declaratory relief, including declaring that the Vaccine Condition remains unsatisfied because the FDA has not approved a COVID-19 vaccine for children under six months old; and, based on these rulings, a permanent injunction prohibiting the State from seeking certain execution orders until all COVID-19-related conditions and notice requirements are met.[7] Citing *Federal Defender I*, 315 Ga. at 351, the trial court explained that "[u]nder binding law of the case, the Vaccine Condition 'places no limitation on the age of who is considered a member of the public'" and that COVID-19 vaccines are not currently available to "all members of the public" because the FDA has not approved their

---

[7] The trial court also enjoined the State from seeking an execution order for death row inmate Michael Nance. The trial court explained that, while the Agreement provides that the State would not seek Nance's execution order "until the United States Supreme Court has denied a request of certiorari from the Eleventh Circuit Court of Appeals of his § 1983 litigation," its plain language and context supports that this was intended as an additional condition that must be met, rather than the sole one. The State contends that the COVID-19-related conditions apply only to inmates whose federal habeas proceedings were resolved during the judicial emergency and that Nance does not fall within this group. Because we conclude that the trial court erred in construing the Vaccine Condition, which contributed to its imposing the injunction, and reverse the trial court's order, we do not find it necessary to reach the merits of this claim.

6

use for children under six months old. The trial court further explained that, without the injunction, "Plaintiffs will be deprived of the bargained-for time and notice needed to adequately prepare for clemency proceedings," and "Presnell and the other prisoners covered by the Agreement will face grave damage: premature death." This appeal followed.

2. As a threshold matter raised by the Appellees' motion to dismiss, we first consider whether this Court has jurisdiction over the State's direct appeal. The Appellees contend that, because Presnell's intervention complaint is an "action" under the Prison Litigation Reform Act ("PLRA"), OCGA § 42-12-1 et seq., the State's appeal must be dismissed as the PLRA requires that "[a]ppeals of all actions filed by prisoners shall be as provided in Code Section 5-6-35 [concerning discretionary applications]." OCGA § 42-12-8. We disagree.

When interpreting a statute, we give the text its "plain and ordinary meaning," *Deal v. Coleman*, 294 Ga. 170, 172 (2013) (punctuation omitted), and we discern that meaning by reading the relevant language "in its most natural and reasonable way, as an ordinary speaker of the English language would," *State v. Islam*, 321 Ga. 30, 32 (2025) (punctuation omitted). To that end, we must consider the text not in a vacuum, but in the "context in which it appears." Id. (punctuation omitted). This includes considering the surrounding statutory language, the statute's structure and history, and other law that makes up the legal backdrop against which the language was enacted. See *State v. Harris*, 319 Ga. 665, 667 (2024).

The key question is whether this appeal is from an action filed by a prisoner under the PLRA. See OCGA § 42-12-8. The parties do not dispute that Presnell is a "prisoner" under the PLRA. See OCGA § 42-12-3(4) (defining "[p]risoner," in relevant

7

part, as "a person 17 years of age or older who has been convicted of a crime and is presently incarcerated"). Nor is it disputed that Presnell did not file the underlying lawsuit or initiate this appeal and that the Federal Defender, which filed the underlying lawsuit, and the State, which initiated this appeal and the previous appeal, are not prisoners. Instead, the Appellees argue that because Presnell intervened in the lawsuit, he became a party-plaintiff and should be considered as initiating the action and that the intervention itself should be considered an "action" under the PLRA.

We reject the Appellees' contention that as an intervenor, Presnell is considered to have filed the action below. "[I]ntervenors are bound by the fundamental rule that an intervenor takes the case as he finds it and cannot inject new issues." *Undercofler v. Seaboard Air Line R. Co.*, 222 Ga. 822, 829 (1966). See also *Todd v. Conner*, 220 Ga. 173, 179 (1964) ("In all instances, … the intervenor takes the case as he finds it[.]"); *O'Brien v. Builders Ins.*, 350 Ga. App. 77, 78 (2019) (quoting *AC Corp. v. Myree*, 221 Ga. App. 513, 515 (1996) ("'A true intervenor takes the case as he finds it and cannot expand the litigation; he or she merely stakes a claim to a share in the results of the pending litigation.'")). And, as a true intervenor, Presnell did not expand the litigation below; he simply joined the pending action to stake a claim in its results. Thus, Presnell cannot be considered as filing the action below.

The Appellees also contend that an intervention is a "proceeding" within the meaning of the PLRA's definition of "action," which is defined by statute as "any civil lawsuit, action, or proceeding." OCGA § 42-12-3(1). We disagree. A person seeking to intervene files an "application" or "motion" in "an *action*." See OCGA § 9-11-24 (emphasis supplied). Moreover, the PLRA applies only to civil proceedings, see OCGA § 42-12-3(1), and in the

8

context of civil proceedings, "action" is ordinarily understood as an "entire lawsuit." *State v. SASS Grp., LLC*, 315 Ga. 893, 900–01 (2023) (explaining that "'action' is more commonly used to refer to a 'whole lawsuit' rather than a claim"). See also, e.g., Merriam Webster's Collegiate Dictionary (11th ed. 2020) (defining "action" as "the initiating of a proceeding in a court of justice by which one demands or enforces one's right"). Indeed, "[p]roceeding" is generally defined as "the form and manner of conducting juridical business before a court or judicial officer," and "may be used synonymously with 'action' or 'suit' to describe the entire course of an action at law or suit in equity from the issuance of the writ or filing of the complaint until the entry of a final judgment." *Proceeding*, Black's Law Dictionary (6th ed. 1990). See also *Proceeding*, The American Heritage Dictionary: Second College Edition (3rd ed. 1993) (defining "proceeding" as "legal action" and "litigation"); *Proceeding*, The Law Dictionary, Wesley Gilmer, Jr. (6th ed. 1986) (defining "proceeding" as "an action at law or a suit in equity"). Because Presnell's motion to intervene was a pleading filed in a pending lawsuit, it cannot reasonably be considered an "action" filed by a prisoner as defined by the PLRA.

The cases relied on by the Appellees do not change our conclusion. While *Ray v. Barber*, 273 Ga. 856 (2001), held that the PLRA requires even non-prisoners to appeal by application, see id. at 856, we later clarified that this rule applies "when a non-prisoner files an appeal of an action *originally filed* by a prisoner," *Brown v. Crawford*, 289 Ga. 722, 725 (2011) (emphasis added). And though *Griffin v. Keller*, 278 Ga. 878 (2005), held that a non-party prisoner's appeal from the denial of his motion to set aside a mandamus judgment was subject to the PLRA, see id. at 879, that is consistent with the statutory definition of "action" as "appeals … filed by a prisoner," OCGA § 42-12-3(1). Finally, although the Appellees assert that *Serpentfoot v. Salmon*, 225 Ga. App. 478

(1997), held that a prisoner's motion for contempt was an "action" subject to the PLRA, the prisoner's so-called "motion" was not filed in an existing proceeding but, rather, it initiated the proceedings in that case. Id. at 478.

Thus, because the PLRA requires appealing by discretionary application only if the appeal arises from "actions filed by prisoners," OCGA § 42-12-8, of which Presnell's intervention does not qualify, the form of this appeal is proper. Accordingly, we deny the Appellees' motion to dismiss.

3. Turning to the merits, we start by setting out the legal standard for reviewing a grant or denial of summary judgment. "We use a de novo standard of review on appeal from a grant [or denial] of summary judgment, and view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the non-movant." *Kaplan v. City of Sandy Springs*, 286 Ga. 559, 560 (2010), disapproved on other grounds by *Sumter Co. v. Morris*, 318 Ga. 1, 10 (2023). Under OCGA § 9-11-56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In reviewing a motion for summary judgment, we are not required to accept legal conclusions in the supporting materials. See *GE Cap. Mtg. Servs., Inc. v. Clack*, 271 Ga. 82, 84 (1999) ("The surveyor's testimony to the contrary was a legal conclusion and, as such, cannot be considered as evidence on motion for summary judgment."); *Love v. Love*, 259 Ga. 423, 424 (1989) (explaining that where the appellant's affidavit contained inadmissible legal conclusions, "the conclusions are to be disregarded in considering the affidavit in connection with the motion for summary judgment").

On summary judgment, the following material facts are undisputed.[8] In the Agreement with respect to the Vaccine Condition, the Office of the Attorney General set out:

> Our office will not pursue an execution warrant from the District Attorney in the below defined cases before … a vaccination against COVID19 is readily available to all members of the public.

Although COVID-19 vaccines were in short supply during the pandemic and for some time after, the supply now exceeds the public's demand. And, though COVID-19 vaccines were not yet FDA-approved for children under five years old when the interlocutory injunction was imposed, in June 2022, COVID-19 vaccines were FDA-approved for all persons who are at least six months old. As explained by the Appellees' epidemiology expert, Dr. Aaron Siegler from Emory University, the FDA is the final decision-making body that determines vaccine approval for all vaccines.[9] Its approval determinations are based on collected

---

[8] In granting summary judgment, the trial court is supposed to view the facts in the light most favorable to the nonmoving party or rely on undisputed facts. Yet the trial court here made factual findings in the summary judgment order, even though some were disputed. We do not rely on those disputed findings but, instead, review the record de novo and set out only the record's relevant, undisputed facts.

[9] The Public Health Service Act ("PHSA") and the Federal Food, Drug, and Cosmetic Act ("FDCA") provide the FDA with the authority to regulate vaccines. Defining a vaccine as a "biological product," 42 USC § 262(i)(1), under the PHSA, the FDA can only issue a biologics license if the vaccine is shown to be "safe, pure, and potent," 42 USC § 262(a)(2)(c)(i)(I). See also 42 USCA § 262(a)(1)(A) (prohibiting the introduction into interstate commerce of any biological product unless a biologics license is in effect for the product). And, under the FDCA, the FDA must approve all drugs—to include vaccines—on the market as safe and effective. See 21 USC § 355(a) ("No person shall introduce or

11

safety and efficacy data related to the approved cohorts. In making its final determination about COVID-19 vaccines, the FDA convened its staff of professionals and a panel of external scientists and other experts in the field to advise during the approval processes. And, because of the public health emergency caused by the pandemic, COVID-19 vaccines initially received FDA approval by emergency use authorization ("EUA"), which expedited approval based on less data than used in the FDA's standard approval process to obtain full vaccine clearance. However, the relevant studies still had to show the safety and effectiveness of the vaccine to obtain approval by EUA. After EUAs were granted, the FDA gathered its own additional data and had other pharmaceutical or other testing companies gather sufficient data to begin allowing for full vaccine clearance. As of March 2024, the FDA had granted full clearance of COVID-19 vaccines for adults, while children six months old and older had at least EUA approval. Regardless, Dr. Siegler identified no functional difference between the two approval types. Once a vaccine is FDA-approved, promotion of the vaccine is allowed to move forward.

With respect to vaccine availability to children under six months old, Dr. Siegler testified that "it's very likely that vaccines will be eventually approved for this age group." The State's expert, Dr. Peter Rissing, likewise agreed that there is a "probability" that, in the coming months or years, vaccines will "become available" to this age group. And, by November 2023, the FDA

---

deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) [of this section] is effective with respect to such drug."). Once FDA-approved for any indication, the product may be placed on the market and prescribed for any use. See *Ironworkers Local Union 68 v. AstraZeneca Pharms., LLC*, 634 F3d 1352, 1356 n.5 (11th Cir. 2011).

had approved two clinical trials involving that age group. However, both clinical trials have since been terminated. And, to date, the FDA has still not approved COVID-19 vaccines for children under six months old. That said, while other vaccines have been approved for children under 12 weeks old—like Hepatitis B and the newly FDA-approved RSV vaccines that may both be administered to infants at birth—most vaccines are not generally recommended for children under six months old.

On appeal, the State argues that the trial court erred in concluding that under the law-of-the-case doctrine, this Court had already determined in *Federal Defender I* that the Vaccine Condition "places no limitation on the age of who is considered a member of the public," and that, consequently, "because the FDA has not approved COVID-19 vaccines for children under six months old[,] … they remain unavailable to 'all members of the public.'" While we agree with the trial court that under the law-of-the-case doctrine, the Vaccine Condition's reference to "all members of the public" includes children under the age of six months, we disagree that under the plain language of the Vaccine Condition, FDA-approval is required for the COVID-19 vaccine for all members of the public.

Turning first to the meaning of the Vaccine Condition's phrase "all members of the public," in *Federal Defender I*, we held that "the Agreement's plain language, drafted by the State, places no limitation on the age of who is considered a member of the public." 315 Ga. at 351. The State argues that *Federal Defender I* is not binding law of the case because that decision involved a preliminary ruling and was based on an incomplete record. However, we have rejected similar arguments, concluding that rulings, even on review of interlocutory injunctions, are binding on subsequent proceedings because they are unaffected by changes

13

in evidence. See, e.g., *Pirkle v. Turner*, 281 Ga. 846, 846–47 (2007) (concluding that a prior decision addressing a legal question concerning the validity of certain deeds on review of a preliminary injunction was "binding as the law of the case and is not open for us to revisit" because "there is no amount of new evidence that could change … a question of law"). Thus, this ruling is the law of the case and remains binding on all further proceedings. See OCGA § 9-11-60(h) (stating, in relevant part, that "any ruling by the Supreme Court … in a case shall be binding in all subsequent proceedings in that case in the lower court and in the Supreme Court or the Court of Appeals as the case may be").

We turn next to what it means under the Vaccine Condition that a COVID-19 vaccine is "readily available" to all members of the public, including children under the age of six months. The cardinal rule of contract construction is "to ascertain the intent of the parties." *State Auto Prop. and Cas. Co. v. Matty*, 286 Ga. 611, 612 (2010). "[W]e generally accept that contractual terms carry their ordinary meanings." *Archer W. Contractors, Ltd. v. Estate of Pitts*, 292 Ga. 219, 224 (2012). And looking to the dictionary is "a good place to start," as "a dictionary is a useful tool for narrowing the range of meanings ordinarily attributed to a word." Id. That said, our analysis into the plain meaning "is neither confined to this sole provision nor to the literal meaning of the phrase[.]" *Langley v. MP Spring Lake, LLC*, 307 Ga. 321, 325 (2019). Instead, "the context in which a contractual term appears *always* must be considered in determining the meaning of the term." Id. (emphasis in original; cleaned up). Thus, to determine what the parties intended to address in drafting the condition, we consider the common meanings of the words used, the Agreement as a whole, and "the legal context in which [the Agreement] was created." Id.

14

"Readily available" is not a term of art and is not defined by the Agreement, so we start by looking at the dictionary definitions of these terms. "Readily" is defined as "in a ready manner," "without much difficulty," and "easily." *Readily*, Merriam-Webster's Collegiate Dictionary (11th ed. 2020). See also *Readily*, The American Heritage Dictionary (5th ed. 2012) (defining "readily" as "[w]ithout hesitation; willingly," and "[w]ithout difficulty; easily"); *Readily*, New Oxford American Dictionary (3rd ed. 2010) (defining "readily," in pertinent part, as "without delay or difficulty; easily"). And "available" is defined, in relevant part, as: "present or ready for immediate use" and "accessible, obtainable." *Available*, Merriam-Webster's Collegiate Dictionary (11th ed. 2020). See also *Available*, The American Heritage Dictionary (5th ed. 2012) (defining "available" as "[p]resent and ready for use; at hand; accessible," and "[c]apable of being gotten; obtainable"); *Available*, New Oxford American Dictionary (3rd ed. 2010) (defining "available," in pertinent part, as "[a]ble to be used or obtained; at someone's disposal"). Construed together, this adjective phrase means that a COVID-19 vaccine must be present or accessible and without much difficulty to obtain (or rather easily obtainable). When further interpreted considering our holding in *Federal Defender I* that the condition's plain language "places no limitation on the age of who is considered a member of the public," 315 Ga. at 351, we conclude that the condition requires that COVID-19 vaccines must be accessible or obtainable without much difficulty to all persons, regardless of age.

With that construction in mind, we see nothing in the plain meaning of the term "readily available" that requires FDA approval of a COVID-19 vaccine for all age groups or in any way conditions the determination of whether the COVID-19 vaccine is "readily available" based on the regulatory decisions of the FDA.

15

A court is not permitted to add terms to the language of the contract but, rather, it is bound by the words chosen by the parties. See *Daniel v. Daniel*, 250 Ga. 849, 851 (1983) ("There is a strong public policy in favor of enforcing contracts as written and agreed upon."). Thus, by adding an FDA-approval requirement for all age groups, the trial court erred in its construction of the Vaccine Condition.

4. Having now construed the terms of the Vaccine Condition, we consider whether a genuine issue of material fact exists that a COVID-19 vaccine is "readily available to all members of the public." The parties do not dispute that since March 2023, vaccines are "readily available" to all persons at least six months old. Thus, we focus our analysis on whether the COVID-19 vaccine is also readily available to children under the age of six months, which under the circumstances means whether a parent can obtain the vaccine for her child without much difficulty.

A review of the record reveals nothing that legally prohibits children of any age from receiving a COVID-19 vaccine, if requested by a parent and deemed medically appropriate. Most vaccines—like COVID-19 vaccines—are not generally recommended for children under six months old, which could impact whether a parent chooses to request a COVID-19 vaccine for her child or whether a provider would agree in the exercise of her medical judgment to administer the vaccine, but that does not mean that the vaccine is not available or obtainable.[10] Moreover, it is undis-

---

[10] For instance, Dr. Siegler, the Appellees' epidemiology expert, agreed that the COVID-19 vaccine is available for persons aged six months and older while acknowledging that a person may have "certain conditions that may be counter indicated" or that there are "other exceptions," which may preclude the person from obtaining a COVID-19 vaccine.

16

puted that the supply of COVID-19 vaccines now exceeds the public's demand.

While the Appellees' expert averred by affidavit that "[b]ecause the FDA has not authorized any COVID-19 vaccine for those who are younger than 6 months of age, medical and pharmaceutical providers cannot provide the vaccine to children in this age range due to the lack of a label indication and differences in dosing amounts for different age groups," the expert did not point to anything in the label indications or dosing amounts that would prohibit a medical provider from providing the vaccine to children under the age of six months. The expert also did not refer to any statute or regulation from the FDA or any other entity that would otherwise prohibit a medical provider from giving the vaccine to anyone, if the provider deemed it medically appropriate. As such, this statement appears to be a legal conclusion, which we are not required to accept for purposes of determining whether a genuine issue of material fact exists as to whether the COVID-19 vaccine is "readily available" to "all members of the public."[11] See *Clack*, 271 Ga. at 84; *Love*, 259 Ga. at 424.

Given that the State produced undisputed evidence that

---

[11] We also note that, during oral argument, the State argued that the administration of a COVID-19 vaccine to persons not indicated as approved by the FDA is considered an "off-label" use and that the FDA does not prohibit "off-label" uses because the FDA does not regulate the practice of medicine. See *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 US 341, 350 (2001) ("'[O]ff-label' usage of medical devices (use of a device for some other purpose than that for which it has been approved by the FDA) is an accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine."). This provides additional support for why FDA approval of the COVID-19 vaccine for certain age groups does not prohibit a medical provider from administering the vaccine to all members of the public, if the provider deems it medically appropriate.

the supply of the COVID-19 vaccine is adequate for all members of the public to obtain the vaccine and that no legal impediment exists for all members of the public to be vaccinated, if deemed medically appropriate, the trial court erred in concluding that the COVID-19 vaccine was not "readily available" to all members of the public. We, therefore, reverse the trial court's order and remand for further proceedings consistent with this opinion.[12]

*Judgment reversed. All the Justices concur, except Peterson, C. J., and Pinson, J., disqualified, Warren, P. J., not participating.*

---

[12] Given this disposition, we find it unnecessary to consider the State's other enumerations of error.

LAND, Justice, concurring.

I concur fully in the majority opinion but write separately to address an issue that I believe to be important as this litigation proceeds. Specifically, the agreement at issue in this case does not state that all execution proceedings for the affected inmates are halted until the three conditions listed in the Agreement have been satisfied. To the contrary, the Agreement simply places a restriction on the Attorney General's office with respect to its pursuit of execution orders from the district attorneys involved in these cases. The Agreement places no restrictions on district attorneys and expressly recognizes "that the District Attorney maintains the sole authority to obtain an execution warrant." Thus, while the Agreement unquestionably ties the Attorney General's hands when it comes to his office's pursuit of execution orders, it does not tie the district attorney's hands at all. If the district attorney wishes to obtain an execution order without the blessing or request of the Attorney General, there is nothing in the Agreement that prevents him or her from doing so. See *McLaughlin v. Payne,* 295 Ga. 609, 612 (2014) ("Under our State Constitution, '[i]t shall be the duty of the district attorney to represent the state in all criminal cases in the superior court of such district attorney's circuit[.]'") (quoting Ga. Const. of 1983, Art. VI, Sec. VIII, Par. I (d)).

I am authorized to state that Justice Ellington and Justice LaGrua join in this concurrence.